## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| AQUENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 6:13-cv-1889 |
| | ) | |
| MARY STAPLETON, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF AQUENT LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Aquent LLC ("Aquent" or the "Company") hereby moves for a temporary restraining order and preliminary injunctive relief.  Aquent seeks the immediate entry of a temporary restraining order, or alternatively, a hearing on its motion for a TRO on Thursday, December 12, 2013, or as soon thereafter as may be convenient for the Court.   Aquent seeks injunctive relief to protect itself from the improper and unfair actions of Defendant Mary Stapleton ("Defendant" or "Stapleton"), due to her unlawful misappropriation, use, and disclosure of Aquent's trade secrets and proprietary business information.

## FACTUAL BACKGROUND

### I.       Aquent And Its Confidential Information And Trade Secrets

Aquent is a global staffing firm headquartered in Boston, Massachusetts.  Aquent helps its corporate clients ("Clients") find specialized temporary and permanent staffing for high-end marketing positions, creative positions, and web experts.  *See* Declaration of Jennifer Horton in Support of Plaintiff Aquent LLC's Motion for Temporary Restraining

Order and Preliminary Injunction (hereinafter the "Horton Decl."), filed simultaneously herewith, at ¶ 4.  Aquent staffs its consultants ("Talent") on assignment with its Clients in virtually every marketing discipline.  *Id.*  Aquent, through hard work, dedication, and investment over more than 27 years, has earned the reputation among its Clients globally as an industry leader in the creative and marketing staffing industry.  *Id.* at ¶ 5.  To meet its Clients' and Talent's expectations and needs, Aquent has developed and maintained, at great expense, valuable working relationships and substantial goodwill with its Clients and Talent.  *Id.* at ¶ 7.

To maintain its long-standing Client and Talent relationships and to develop new relationships, Aquent expends substantial time, effort, and expense developing confidential business information and trade secrets.  *Id.* at ¶ 9.  Such confidential business information and trade secrets include, but are not limited to: information regarding Aquent's Clients, Talent, prior order history, and historical sales and revenue information, including sensitive pricing, mark-up, and margin information regarding rates charted to Clients for the work of Talent on a given project and rates paid to those Talent for that work, Client's purchasing tendencies, compiled Client and Talent contact information, Talent's private personal data, Talent compensation information, types of projects worked on for Clients, knowledge of particular Talent placed successfully on prior assignments for particular Clients, the departments within a Client with which Aquent was working, Clients' internal hierarchy of decision-makers and their contact information, and pending Client projects and proposals.  *Id.* at ¶ 10.

2

Aquent's trade secrets and confidential information are not generally known in the industry or outside of Aquent, and could be learned by others, if at all, only through the expenditure of considerable time, effort, and expense. *Id.* at ¶ 11. Aquent's trade secrets and confidential information are critical to Aquent's competitive position in the staffing industry. *Id.* at ¶ 22. If Aquent's trade secret information were to fall into the hands of a competitor, Aquent's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. *Id.* at ¶ 23. Likewise, if a former internal employee, such as Defendant, retained Aquent's confidential trade secrets after her employment ended, and she accessed them while working for a competitor, Aquent's competitive position would be seriously harmed. *Id.*

Accordingly, Aquent's policies and procedures require that its trade secrets and confidential information be kept strictly confidential by its internal employees, and Aquent restricts access to such information. *Id.* at ¶ 14. Among other precautions, Aquent requires its internal employees to enter confidential, personal usernames and passwords in order to gain access to Aquent's server and e-mail accounts. *Id.* at ¶ 15. Aquent further requires internal employees to enter a second, unique username and password in order to gain access to the confidential, secure "CloudWall" database, where its confidential information and trade secrets are kept. *Id.* In addition, internal employees are required to change their CloudWall password at least every 90 days for security purposes. *Id.*

## II.    Defendant's Employment With Aquent

Defendant was employed by Aquent for approximately eight years until she resigned voluntarily, effective September 27, 2013. *Id.* at ¶ 17. At the time of her resignation, she

was Aquent's Vice President and Managing Director of Media, Entertainment, Travel, and Hospitality, a role in which she served for more than a year.  *Id.*  As the Vice President and Managing Director of Media, Entertainment, Travel and Hospitality, Defendant was responsible for Aquent's staffing in these industries nationwide.  *Id.* at ¶ 18.  She led a staff of approximately 17 internal employees (Agents and Account Directors), who developed business from existing and new Clients and Talent.  *Id.*

As a condition of her employment with Aquent, Defendant received and signed an offer letter from Aquent on February 2, 2005, which stated, among other things, that in consideration and as a condition of her employment, she would be required to keep Aquent's proprietary business information and trade secrets confidential during her employment and at all times thereafter, and could use such information only within the scope of her duties to the Company.  *Id.* at ¶ 19.  The offer letter also required that at the end of her employment, she had to return all materials and information provided to her by Aquent.  *Id.*

Likewise, Defendant received a copy of Aquent's Employee Handbook, which requires, among other things, that proprietary business information and trade secrets  not be disclosed during or after Defendant's employment and they were to be handled in strict confidence.  *Id.* at ¶ 20.  The Employee Handbook also reiterates that upon her separation from the Company, Defendant was required to return all Aquent property immediately (including Aquent's confidential information and trade secrets).  *Id.*

While employed by Aquent, and subject to the aforementioned conditions, Defendant was given access to Aquent's trade secrets and confidential information, including the highly

confidential information contained in the CloudWall regarding Aquent's Clients and Talent, as well as confidential sales revenue reports and data. *Id.* at ¶ 21.

### III. Defendant Leaves Aquent To Join A Competitor, And Recruits Her Subordinates, Martinez And Merriam, To Join Her

On August 24, 2013, Defendant announced that she was resigning from Aquent. *Id.* at ¶ 24. She did not, however, inform Aquent until September 10, 2013 that her last day would be September 27, 2013. *Id.* At the time she submitted her resignation, Defendant assured her boss, President Ann Webster ("Webster"), that she did not have a new job. *Id.* Instead, Defendant informed Webster that she was resigning for health reasons. *Id.* This was not true. *Id.* at ¶ 25.

Aquent later learned that, contrary to Defendant's misrepresentations to Webster, the founders of iTalent LLC ("iTalent"), an Aquent competitor, had offered Defendant a job as early as May 2013. *Id.* at ¶ 26. Indeed, upon receiving this offer at her Aquent email account, Defendant immediately forwarded it to her personal email account. *Id.* Defendant then began discussing job opportunities, ostensibly at iTalent, with two of her subordinates at Aquent, Rhonda Martinez ("Martinez") and Chrystal Merriam ("Merriam"). *Id.* at ¶ 27. A review of Merriam's Google Chat records uncovered a conversation between Martinez and Merriam on May 28-29, 2013, that clearly indicates that they were in discussions with Defendant at that time to leave Aquent. *Id.* at ¶ 28.

Thus, despite the fact that Defendant told Aquent that she did not have new employment arranged, and that she was leaving for health reasons, it is clear that she immediately went to work for iTalent. Because Defendant explicitly denied that she was joining a competitor, Aquent allowed her to remain an active employee with continued

5

access to Aquent's confidential information and trade secrets between August 24 and her last day on September 27.  *Id.* at ¶ 34.   Had Defendant been forthright and informed Aquent that she was joining a competitor, the Company would not have let her continue to have access to its confidential information and trade secrets.  *Id.*

On September 3, 2013, one week after Defendant's notice of resignation, Martinez submitted her notice of resignation to Aquent, via Defendant, effective September 13, 2013. *Id.* at ¶ 30.  Defendant relayed this news to Webster.  *Id.*  When Aquent asked Defendant if Martinez was leaving to join a competitor, however, Defendant again lied, and reported that although Martinez was joining iTalent, it was not a competitive situation because iTalent's staffing business was limited to I.T. staffing.[1]  *Id.* at ¶ 31.  Based on Defendant's misrepresentation, Aquent permitted Martinez to remain with Aquent through September 13, 2013 with full access to its confidential information.  *Id.* at ¶ 32.  Defendant knew at the time that she would be joining iTalent with the intent of expanding its business into the creative and marketing staffing space (and thus become a competitor).  *Id.* at ¶ 31.  Like Defendant, had Aquent known that Martinez was joining a competitor -- particularly that she was doing so with Defendant -- the Company would not have let her continue to have access to its confidential information and trade secrets in the ten days between her notice of resignation and her last day.  *Id.* at ¶ 32.

Finally, on September 27, 2013 (Defendant's last day), Merriam, too, submitted her notice of resignation, effective October 11, 2013.  *Id.* at ¶ 33.  Merriam, likewise, did not

---

[1] In fact, Martinez acknowledged in written communications to an acquaintance as early as August 12, 2013 that she had accepted a new job but was waiting to give notice in order to take advantage of Aquent's medical benefits for her family.  *Id.* at ¶ 29.

reveal that she was joining a competitor, or that she would be working with Defendant and Martinez. *Id.* As with Defendant and Martinez, had Aquent been informed that Merriam was joining a competitor, the Company would not have let her continue to have access to its highly confidential trade secrets in the two weeks between her notice of resignation and her last day. *Id.*

At no time prior to their resignations was Aquent aware that Defendant, Martinez, and Merriam were leaving to join a competitor together. And Defendant made sure Aquent did not know by making several affirmative misrepresentations about her own intentions and the intentions of Martinez. *Id.* at ¶¶ 31-34.

Prior to iTalent's hiring of these three women, it did not provide digital, creative, and marketing staffing. *Id.* at ¶ 35. Rather, iTalent was purely an I.T. staffing agency. *Id.* On information and belief, iTalent hired Defendant, Martinez, and Merriam to form a digital, creative, and marketing group.[2] *Id.* at ¶ 36.

## IV.   Aquent Discovers And Attempts To Mitigate Defendant's Misconduct

On or about November 8, 2013, Aquent learned via LinkedIn that Defendant, Martinez, and Merriam were all working together at its competitor, iTalent. *Id.* at ¶ 41. This,

---

[2] Indeed, a new iTalent web site that apparently is not yet active states that "We match digital creative and marketing talent with YOUR team." (Emphasis added.) *Id.* at ¶ 37 (attaching a true and accurate copy of the website at Exhibit A). This web site can only be accessed through http://frankjuval.com/web/italent/01/index.html, which is the business web site of an Orlando-based "Web Professional" named Frank Juval Quinones. *Id.* Notably, Quinones is an Aquent Talent whom Defendant and/or Merriam engaged to design iTalent's new web site to introduce this new segment of iTalent's business that Defendant would lead. *Id.* They engaged Quinones to perform this work while they were still working for Aquent, without disclosing this engagement and clear conflict of interest to Aquent. *Id.* This new web site was intended to help iTalent compete with Aquent. *Id.*

Another currently inactive iTalent web site page states that the company "match[es] traditional, modern, and upcoming technological needs of business with digitally creative, highly technical, and business savvy professionals." *Id.* at ¶ 38 (attaching a true and accurate copy of the web site, http://184.173.230.182/~italent/, as Exhibit B).

of course, came as a huge surprise to Aquent.  As a result, Aquent began an investigation to determine Defendant's activities on the CloudWall during the last few weeks of her employment.  *Id.*  Among other things, Aquent immediately engaged a computer forensics firm, Stroz Friedberg, to analyze and assess the extent of Defendant's wrongful taking of information from Aquent's computer systems, as well as her attempts to delete any trail of her misconduct.  *Id.* at ¶ 42.  Aquent soon discovered that Defendant had been engaged in a highly unusual and suspicious level of search and download activities during her last days and weeks on the job.  *Id.* at ¶ 41.  These searches and downloads went far beyond any legitimate business need.[3]  *Id.*

While Aquent's investigation is ongoing, it has already discovered substantial evidence of Defendant's misconduct.  *Id.* at ¶ 44.  For example, Aquent has discovered that starting in or about June 2013, Defendant began regularly searching the CloudWall and exporting and downloading vast amounts of highly confidential information to her laptop computer.  *Id.* at ¶ 43.  While Defendant had previously performed limited searches and downloads for purposes of her job,[4] Defendant's searches beginning in June 2013 were far

---

[3] Not knowing Defendant was working for a competitor, Aquent had engaged in discussions with Defendant at the time of her resignation concerning her request to purchase her Company laptop.  *Id.* at ¶ 40.  But, when the Company informed Defendant that she would first need to return it so that the Company could wipe it clean, she ceased communications with the Company and did not return the laptop.  *Id.*  On November 14, 2013, Aquent's outside counsel sent a letter to Defendant demanding that she return the Company laptop and informing Defendant of her evidence preservation obligations.  *Id.* at ¶ 59.  Although Defendant did not contact Aquent or its counsel in response to this correspondence, she did send the laptop to Aquent's headquarters via FedEx, and it arrived on November 18, 2013.  *Id.*

[4] Defendant's previous searches were very targeted and the information downloaded was, expectedly, minimal.  *Id.* at ¶ 45.  She might, for instance, have needed to look at prior assignments for a particular Client, if working on a sales pitch or request for proposal for new work for that Client.  *Id.*  However, Defendant should not have needed to run the broad scope of the CloudWall searches she ran in her last few months and weeks on the job, nor should she have needed to run searches and download the results at the frequency of which she was performing these searches and downloads.  *Id.* at ¶ 46.  Moreover, she had no legitimate business reason to download information from CloudWall to her laptop or a USB thumb drive.  *Id.*

more frequent (dozens of searches daily as opposed to a few per month), the downloads were much larger (thousands of results as opposed to a small handful), the timing became much more suspicious (the middle of the night and on weekends as opposed to during regular business hours), and she began exporting the results to at least three external USB thumb drives. *Id.* at ¶ 45-47. Indeed, there was a marked uptick in Defendant's search and download activity in September 2013, when she began running hundreds of searches per day and downloading tens of thousands of results at all hours of the day and night, including on weekends. *Id.* at ¶ 48. This not only continued after August 24, 2013, when she gave notice of her resignation, but actually increased. *Id.* In fact, Defendant transitioned her accounts and employees to two other Aquent managers in or around early September 2013, and she therefore had no legitimate reason to conduct such extensive searching and downloading thereafter. *Id.* at ¶ 56. For example:

- On Friday, September 13, 2013, Defendant ran seven searches between 11:42 p.m. and 11:59 p.m., and downloaded 3,899 results. Later that night, between 12:01 a.m. and 12:19 a.m. on September 14, 2013, Defendant ran an additional 23 searches and downloaded 11,152 more results. In total, between 11:42 p.m. and 12:19 a.m., Defendant ran 30 searches and downloaded more than 15,000 results. This all occurred on a Friday night, just days after submitting her resignation and providing false information about her intentions.

- On September 24, 2013, Defendant ran 10 more searches between the hours of midnight and 8:50 a.m., and downloaded more than 21,200 additional results.

- On September 25, 2013, Defendant ran 28 searches between 9:42 p.m. and 10:27 p.m., and downloaded more than 54,000 results.

- On Defendant's second to last day with Aquent, September 26, 2013, Defendant ran more than 100 searches and downloaded more than 128,200 results between 10:56 a.m. and 11:45 p.m.

- The following day, September 27, 2013, her last with Aquent, Defendant began searching CloudWall at 9:24 a.m. and did not stop until 3:29 p.m., and she downloaded more than 41,500 results during that period.  Indeed, forensic computer data reveals that her thumb drives were connected to her laptop while accessing these CloudWall search result reports.

- In total for the month of September 2013, Defendant ran more than 500 separate searches and downloaded approximately 600,000 results.

*Id.* at ¶¶ 49-54.

Defendant's searches and downloads contained highly confidential data, including information regarding order history, Clients, and Talent, that was not even related to Defendant's job functions.  *Id.* at ¶ 44.  For example, Defendant downloaded information related to clients in the South Florida market, including clients that were not within the media, entertainment, travel, or hospitality industries for which she was responsible. *Id.*

In addition to downloading information to her laptop, Defendant also began downloading vast amounts of information to at least three separate USB thumb drives during this period.  *Id.* at ¶ 55.  Indeed, during her final two weeks of employment from September 15 through 27 alone, in addition to the downloads to her laptop, Defendant downloaded 111 separate files (containing a currently unknown number of results) to three USB thumb drives. *Id.*  On September 26, 2013, the night before her last day of employment at Aquent, Defendant downloaded a file at 9:45 p.m. from the website address "https://cloudwall.aquent.com/" (the CloudWall web site) to a USB thumb drive connected to the Company laptop.  *See* Declaration of Mankin Yuen (hereinafter, "Yuen Decl."), filed simultaneously herewith, at ¶ 11.  That download was one of 46 conducted by Defendant to a USB drive on September 26, 2013 alone.  *Id.* at ¶¶ 13, 16.  The following day, her last day of employment at Aquent, Defendant conducted another 33 downloads to a USB drive.  *See*

Horton Decl. at ¶ 55.  Aquent's investigation has also revealed that Defendant accessed some

of these confidential files even in October 2013, after she left Aquent, when she was, on

information and belief, employed by iTalent.  *See* Yuen Decl. at ¶¶ 19-21.

There was absolutely no business justification for this volume of searches and

downloads to the laptop or to the USB thumb drives, particularly after Defendant had given

notice to Aquent that she was resigning and during her final days and hours of employment.

*See* Horton Decl. at ¶ 56.  Indeed, most of these downloads occurred after Defendant had

already transitioned her accounts and employees to other Aquent managers in or around early

September 2013.  *Id.*  Defendant certainly had no business reason on behalf of Aquent to be

running searches and downloading hundreds of results to her laptop at 3:29 p.m. on her last

day, literally her final hours of employment at Aquent.  *Id.*  Additionally, it appears that

Defendant may have deleted her laptop internet browser history prior to returning it to

Aquent, ostensibly in a clumsy attempt to cover her tracks.  *Id.* at ¶ 57; Yuen Decl. at ¶ 10.

Moreover, even <u>after</u> her last day at Aquent, Defendant accessed confidential information she

had previously downloaded regarding Aquent's Clients and Talent.  *See* Yuen Decl. at ¶ 21.

In a letter that Defendant e-mailed to Aquent's counsel on December 2, 2013, in

response to Aquent's counsel's request that Defendant turn over the USB drives, Defendant

admitted that the thumb drives contained Aquent's information and that Aquent might view

her possession of these thumb drives "in a negative light."  *See* Horton Decl. at ¶¶ 61-62.

Defendant claimed to have since destroyed the thumb drives.  *Id.* at ¶ 62.

## ARGUMENT

Aquent seeks injunctive relief from this Court restraining Defendant, and anyone acting in concert with her (including, without limitation, iTalent, Martinez, and/or Merriam), from further accessing, using, disclosing, and/or copying Aquent's Confidential Information; and further enjoining them from contacting, communicating with, soliciting, attempting to solicit, accepting business from, and/or performing work on behalf of any Aquent Clients or Talent whose identities and/or information are included in any of the materials Defendant misappropriated from Aquent.

To obtain injunctive relief, a plaintiff must show: (1) it has substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) the threatened injury to the plaintiff outweighs possible injury an injunction may cause the opposing party; and (4) an injunction would not disserve the public interest. *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1171 n. 1 (11th Cir. 2002) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)); *Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dunn*, 191 F. Supp. 2d 1346, 1350 (M.D. Fla. 2002).  Florida law specifically provides for injunctive relief against both actual and threatened misappropriation of trade secrets. *All Leisure Holidays Ltd. v. Novello*, 2012 WL 5932364, *5 (S.D. Fla. Nov. 27, 2012) (citing FLA. STAT. § 688.003); *Southeastern Mechanical Servs., Inc. v. Brody*, 2008 WL 4613046, *10 (M.D. Fla. Oct. 15, 2008).  For the reasons set forth below, Aquent meets each of these elements, and the Court therefore should grant Aquent the requested injunctive relief.

### A.      Aquent Is Likely To Prevail On Its Claim For Misappropriation Of Trade Secrets

Aquent seeks injunctive relief under the Florida Uniform Trade Secrets Act ("FUTSA") for misappropriation of its trade secrets.  FLA. STAT. § 688.001 *et seq.*[5]  In order to prevail on a claim for misappropriation of trade secrets under FUTSA, a plaintiff must show that: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret it possessed was misappropriated either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.  *All Leisure Holidays*, 2012 WL 5932364 at *4 (citing *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citing FLA. STAT. § 688.002)).

### 1.      Aquent Possesses Trade Secrets And Takes Reasonable Steps To Protect Their Secrecy

As discussed more fully above, at considerable time and expense, Aquent develops, compiles, maintains and protects substantial amounts of confidential and proprietary information.  This information is not publicly available or easily developed.  If a competitor possessed this information, the competitor could use it to compete unfairly with Aquent.

Florida courts consistently hold that the information Aquent claims as trade secrets is protectable as such.  *See, e.g., Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 60 (Fla. 5th DCA 1995) (holding information on mark-ups on products and profit margins, and names of customers are protectable trade secrets); *Delucca v. GGL Indus., Inc.*, 712 So.2d 1186, 1187

---

[5] Although Aquent has also asserted claims against Stapleton for unfair competition, breach of fiduciary duty, breach of duty of loyalty, conversion, and the Computer Fraud and Abuse Act, at this time, it is not seeking injunctive relief under those claims.

(Fla. 4th DCA 1998) (customer information not available from other sources are protectable trade secrets); *All Leisure Holidays*, 2012 WL 5932364 at *4 (trade secrets broadly defined under FUTSA; customer lists and information contained therein generally considered trade secrets if compiled from non-public information and kept confidential).

Aquent takes multiple precautions to protect its confidential information.  These precautions include requiring company personnel to sign offer letters containing confidentiality and non-disclosure covenants; limiting access to confidential information by the use of secure computer usernames and passwords to prevent unauthorized access to Company computers; limiting access to CloudWall by the use of secure usernames and passwords (which are distinct from the employees' computer passwords, and which must be changed every 90 days); instructing personnel not to disclose confidential information to persons outside of the Company; and requiring all confidential and proprietary materials to be used for Company purposes only and requiring the return of Company property when employment ends.

### 2.    Defendant Misappropriated Aquent's Trade Secrets

As noted above, Aquent's investigation (which is ongoing) has established that Defendant misappropriated its trade secrets.  Indeed, a forensic examination revealed that, leading up to her resignation, Defendant searched for and downloaded enormous amounts of information, including highly confidential trade secret information, from Aquent's secure database and email systems, to both her laptop (which she refused to return to Aquent until recently, following a demand by Aquent's counsel) as well as to multiple USB thumb drives leading up to her resignation from Aquent (which she has refused to turn over, claiming that

they were destroyed).  Aquent's forensic examination also revealed that Defendant accessed these downloaded files after leaving Aquent (and, on information and belief, when she was working for iTalent).  Defendant has already admitted that she has discarded these USB drives, likely, Aquent submits, in an effort to conceal evidence of her wrongdoing. Unfortunately for Defendant, she did not completely cover her tracks.

Defendants' searches and downloads often occurred at times when she would have no reason to be using the information for legitimate business purposes, such as on weekends and late at night.  In addition, they increased in frequency starting around the time she submitted her resignation and not ending until late in the afternoon on her last day at Aquent, September 27, 2013, at one point reaching hundreds of searches daily, and tens (or even hundreds) of thousands of downloaded records daily.

As a result of Defendant's improper access and misappropriation of Aquent's trade secrets, Aquent is suffering substantial and irreparable injury.  Defendant is, on information and belief, using the misappropriated information to compete unfairly with Aquent by using its confidential information to gain an improper commercial advantage.  She is leading iTalent's entry into the creative and marketing staffing space, and using Aquent's trade secrets to build this new business for a company that has no previous client information in this space.  Defendant also will use this information to solicit new business from Clients and Talent.

In circumstances similar to those present here, Florida courts have granted injunctive relief to prevent unfair competition related to the misappropriation of trade secrets.  *See, e.g., Hatfield v. AutoNation, Inc.*, 939 So.2d 155, 157 (Fla. 4th DCA 2006) ("An injunction with

respect to stolen business secrets is authorized where it will eliminate commercial advantage derived from the misappropriation and affirmative acts to protect a trade secret."); *East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. 2d DCA 2001) (awarding injunctive relief where a former employee misappropriated customer information to solicit business accounts of his former employer); *All Leisure Holidays*, 2012 WL 5932364 at *5 (finding substantial likelihood of success on the merits for purposes of request for injunctive relief where facts in complaint established that defendants improperly obtained plaintiff's trade secrets); *Brody*, 2008 WL 4613046, at *11 (injunction warranted where defendants had, among other things, downloaded plaintiff's proprietary information shortly before and after resigning and had deleted files and wiped their laptops' hard drives[6]).  Under the facts present here and pursuant to relevant Florida law, Aquent has a strong likelihood of succeeding on the merits of its claim for misappropriation of trade secrets.[7]

### B.  Aquent Will Suffer Irreparable Injury Without Injunctive Relief

As noted above, Defendant is leading iTalent's entry into the creative and marketing staffing space, and using Aquent's trade secrets to build this new business for a company that

---

[6] Based on pre-suit communications with Defendant, Aquent anticipates that she will contend that she disposed of USB drives potentially containing evidence of her misdeeds because they contained personal information. However, the *Brody* court, in granting injunctive relief, quickly disposed of a similar argument, noting that defendant's testimony that he had permanently deleted all the information on his laptop because it contained personal files was "not credible as to why *all* data was removed."  2008 WL 4613046 at *8 (emphasis added).

[7] Even assuming *arguendo* that this Court determines that Defendant has not already misappropriated trade secrets, it should still enjoin her and anyone acting in concert with her from using any of Aquent's trade secrets, as the Florida statute provides that any actual *or threatened* misappropriation of trade secrets may be enjoined. *See* FLA. STAT. § 688.003(1); *Talk Fusion, Inc. v. J.J. Ulrich*, 2011 WL 2681677, *4 (M.D. Fla. June 21, 2011) (recommendation by Magistrate Judge that injunction be granted, even where plaintiff had not provided substantial evidence demonstrating that defendants had misappropriated plaintiff's trade secrets, as plaintiff demonstrated the *threat* of misappropriation).  Here, Aquent has certainly demonstrated that, at the very least, there is a substantial threat that Defendant will misappropriate Aquent's trade secrets.

has no previous client information in this space.  Defendant also will no doubt use this information to solicit new business from Aquent Clients and Talent.

Florida courts have routinely held that irreparable harm is presumed in a case involving misappropriation of trade secrets.  *See, e.g., Dotolo v. Schouten*, 426 So.2d 1013, 1015 (Fla. 2d DCA 1983) (agreeing with plaintiffs that "irreparable harm and inadequate remedy at law should be presumed in an action for injunctive relief with respect to the misappropriation of a trade secret," and noting that the "misappropriation and continuing use of a trade secret constitutes a continuing tort"); *All Leisure Holidays*, 2012 WL 5932364 at *5 (where "damages that might be suffered are speculative -- as in the case of misappropriated trade secrets -- the harm is properly characterized as irreparable because an inadequate remedy at law is presumed"); *You Fit, Inc. v. Pleasanton Fitness, LLC*, 2012 WL 7050984, *3 (M.D. Fla. Oct. 31, 2012) ("a presumption of irreparable harm exists in cases involving alleged misappropriation of trade secrets"); *Brody*, 2008 WL 4613046 at *15 (irreparable harm presumed when a party appropriates or intends to appropriate trade secrets); *Talk Fusion*, 2011 WL 2681677, *5 (same).  Accordingly, as Aquent has alleged that Defendant has misappropriated its trade secrets, irreparable harm absent an injunction is presumed.  *See AutoNation, Inc. v. Hatfield*, 2006 WL 60547, *1 (Fla. Cir. Ct. Jan. 4, 2006) (where defendant downloaded plaintiff's files and sent emails to his personal account just prior to resigning, finding that misappropriation of trade secrets by defendant represented a "substantial threat of irreparable harm, which cannot be remedied with money damages" and thus injunctive relief was "necessary to prevent continued actual and threatened misappropriation and to eliminate the commercial advantage [defendant] has derived from

his misappropriation") (ultimately enjoining defendant from, *inter alia*, disclosing any information regarding plaintiff or its trade secrets, and ordering defendant to return all files or information belonging to plaintiff and to make his personal computer available for a forensic examination), *aff'd*, *Hatfield v. AutoNation, Inc.*, 939 So.2d 155 (Fla. 4th DCA 2006).

### C.    The Irreparable Injury To Aquent Outweighs Any Potential Injury to Stapleton

The injury to Aquent clearly outweighs any injury to Defendant.  Aquent is not requesting, at this time, that the Court prohibit her from working for iTalent.  Rather, Aquent is merely requesting that the Court prohibit Defendant, or anyone acting in concert with her, from accessing, using, or disclosing Aquent's trade secrets and confidential information, and that Defendant, and those acting in concert with her, be enjoined from soliciting any Aquent Client or Talent whose information is included in the files Defendant improperly downloaded.   Defendant will suffer no harm whatsoever if the narrow injunctive relief requested is granted.  *See, e.g., All Leisure Holidays*, 2012 WL 5932364, at *6 (temporary inconvenience to defendants, if any, by precluding their use of trade secrets was outweighed by the threatened irreparable injury).

Defendant was privy to Aquent's trade secrets and confidential information, and she was responsible for overseeing the development and maintenance of Aquent's most important assets, its Clients and Talent.  As a condition of receiving employment, compensation, access to Aquent's Clients, Talent, confidential information, and training, Defendant agreed not to disclose Aquent's confidential information or possess or use it after her employment with Aquent ended.  This Court should promote the enforceability of that

agreement by enjoining Defendant from using any of Aquent's trade secrets or confidential information.  The requested injunctive relief will not injure Defendant in any manner, while the lack of injunctive relief would harm Aquent substantially and irreparably.

D.     **Injunctive Relief Serves the Public Interest**

An injunction is appropriate here to prevent the unlawful use and disclosure of Aquent's trade secrets.  Under Florida law, "an injunction prohibiting a former employee from using trade secrets to solicit existing customers clearly does not disserve the public interest of protecting legitimate business interests." *Aqua Gaming,* 805 So.2d at 934. Indeed, "the existence of Florida's trade secret statute illustrates [the] state's interest in protecting businesses from theft of confidential information." *Hatfield*, 939 So.2d at 158. *See also All Leisure Holidays*, 2012 WL 5932364 at *6 ("Florida law recognizes that protecting trade secrets furthers the public interest").  Thus, the requested injunctive relief will serve the public interest, and this Court should enter an order enjoining Defendant or anyone acting in concert with her (including Mmes. Martinez and Merriam and iTalent) from using or disclosing any of Aquent's trade secrets or confidential information, and from soliciting any Aquent Clients or Talent whose identities and/or information are included in any of the materials Defendant misappropriated from Aquent.

**CONCLUSION**

Aquent has a strong likelihood of success on the merits of its claim for misappropriation of trade secrets.  Defendant misappropriated Aquent's trade secrets in violation of her obligations to Aquent and Florida law.  As a result of Defendant's unlawful acts, Aquent suffered and continues to suffer irreparable harm.  As demonstrated above, both

the balance of hardships and Florida public policy overwhelmingly favor the immediate issuance of an injunction to protect Aquent.  Accordingly, this Court should enter a temporary restraining order and preliminary injunction enjoining Defendant, and any entity or person acting in concert with her, from accessing, using, disclosing, or copying any Aquent trade secrets or confidential and proprietary information, and from contacting, communicating with, soliciting, attempting to solicit, accepting business from, and/or performing work on behalf of any Aquent Clients or Talent whose identities and/or information are included in any of the materials Defendant misappropriated from Aquent. Finally, this Court should order and schedule a hearing for issuance of a preliminary injunction.

WHEREFORE, Aquent respectfully prays that this Court enter an order:

1.      That Stapleton, along with her respective agents, employers, employees, attorneys, and those persons in active concert or participation with her, be temporarily and preliminary enjoined from directly or indirectly:

   a.  misappropriating or threatening to misappropriate, accessing, using, disclosing, revealing, or copying any Aquent trade secret or proprietary business or confidential information, including all copies thereof; and

   b.  contacting, communicating with, soliciting, attempting to solicit, accepting business from, and/or performing work on behalf of any Aquent Clients or Talent whose identities and/or information are included in any of the materials Defendant misappropriated from Aquent.

2.      That Defendant, along with her respective agents, employers, employees, attorneys, and those persons in active concert or participation with her, specifically be required to return to Aquent all trade secrets and confidential information in her or their possession or control, including all copies thereof, and to verify in writing that she has returned all such information, or if not, provide an accounting for any such information that cannot be returned; and

      3.     That a hearing shall be held on Aquent's application for a preliminary injunction.

No prior application for the relief requested herein has been made to this or any other Court.

Respectfully submitted,

/s/ Alex S. Drummond
Alex S. Drummond (Florida Bar No. 0038307)
Daniel B. Klein (to be admitted *pro hac vice*)
Erik W. Weibust (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone:  617-946-4800
Facsimile: 617-946-4801
adrummond@seyfarth.com
dklein@seyfarth.com
eweibust@seyfarth.com

Sally R. Culley (Florida Bar No. 0095060)
RUMBERGER, KIRK & CALDWELL, P.A.
Lincoln Plaza, Suite 1400
300 South Orange Avenue
Orlando, Florida 32801
sculley@rumberger.com

Date: December 10, 2013        *Counsel for Plaintiff Aquent LLC*

16547060v.2